**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ASHLEY JUDD, an individual, *Plaintiff-Appellant*, | No. 19-55499 |
| | D.C. No. 2:18-cv-05724-PSG-FFM |
| v. | |
| HARVEY WEINSTEIN, an individual, *Defendant-Appellee.* | OPINION |

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, District Judge, Presiding

Argued and Submitted May 8, 2020
Pasadena, California

Filed July 29, 2020

Before: Mary H. Murguia and Morgan Christen, Circuit
Judges, and Sidney H. Stein,[*] District Judge.

Opinion by Judge Murguia

---

[*] The Honorable Sidney H. Stein, United States District Judge for
the Southern District of New York, sitting by designation.

## SUMMARY\*\*

### California Law / Sexual Harassment

The panel reversed the district court's dismissal of a sexual harassment claim under California Civil Code section 51.9 brought by actor Ashley Judd against producer Harvey Weinstein.

The panel held that, as alleged, section 51.9 plainly encompassed Judd and Weinstein's relationship, which was "substantially similar" to the "business, service, or professional relationship[s]" enumerated in the statute. Cal. Civ. Code § 51.9(a)(1)(F) (1996). The panel held further that their relationship consisted of an inherent power imbalance wherein Weinstein was uniquely situated to exercise coercion or leverage over Judd by virtue of his professional position and influence as a top producer in Hollywood. The panel concluded that the California Supreme Court would reach the same conclusion, obviating the need to certify the question.

The panel rejected Weinstein's arguments. The panel held that the fact that the traditional balance of power in a relationship may be flipped in some scenarios did not negate the reality that a power imbalance nevertheless tended to exist in these relationships under normal circumstances. The panel also held that there was more than enough to allege a professional relationship at the time of the alleged harassment.

---

\*\* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that whether Judd and Weinstein's relationship was in fact an employment relationship outside the purview of section 51.9 was a question for the trier of fact. The panel remanded for further proceedings.

## COUNSEL

Theodore J. Boutrous (argued) Jr., Theane D. Evangelis, Michael H. Dore, Lauren M. Blas, and Marissa B. Moshell, Gibson Dunn & Crutcher LLP, Los Angeles, California, for Plaintiff-Appellant.

Phyllis Kupferstein (argued), Kupferstein Manuel LLP, Los Angeles, California, for Defendant-Appellee.

Diane F. Boyer-Vine, Legislative Counsel; Robert A. Pratt, Principal Deputy Legislative Counsel; Brent W. Westcott, Deputy Legislative Counsel; Office of Legislative Counsel, Sacramento, California; for Amicus Curiae California State Senate.

Duncan W. Crabtree-Ireland and Danielle S. Van Lier, Screen Actors Guild-American Federation of Television and Radio Artists, Los Angeles, California, for Amicus Curiae Screen Actors Guild-American Federation of Television and Radio Artists.

**OPINION**

MURGUIA, Circuit Judge:

Ashley Judd appeals the district court's dismissal of her sexual harassment claim under section 51.9 of the California Civil Code. Judd alleged that, in the late 1990s, Harvey Weinstein, then an influential and well-connected Hollywood producer, sexually harassed her during a general business meeting. Judd further alleged that, after she rebuffed his sexual advances, Weinstein derailed her potential involvement in the film adaptation of *The Lord of the Rings* book trilogy by telling director Peter Jackson and producer Fran Walsh that he had a "bad experience" with Judd and that she was "a nightmare to work with." The district court granted Weinstein's motion to dismiss for failure to state a claim under section 51.9. We have jurisdiction under 28 U.S.C. § 1291, and we reverse.

**I**

Judd alleged the following facts, which we presume to be true on appeal. *See Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995).

In late 1996 or early 1997, Weinstein invited Judd to a breakfast meeting at the Peninsula Hotel in Beverly Hills, California. At the time, Weinstein was an influential and well-connected Hollywood producer,[1] and Judd was a young aspiring actor in the early stages of her career. Judd had

---

[1] By this time, Weinstein enjoyed broad commercial and critical success through projects such as *Scandal* (1989); *Sex, Lies, and Videotape* (1989); *Tie Me Up! Tie Me Down!* (1989); *The Crying Game* (1992); *Pulp Fiction* (1994); and *Flirting with Disaster* (1996).

previously landed a small role in the 1995 film *Smoke*, which was produced by Miramax, a production company co-founded by Weinstein. The meeting was meant to be a "general" business meeting, not a job interview for any particular role. These kinds of general meetings—a form of business development by which actors can expand their professional relationships with studio executives, producers, casting directors, and other individuals who may link directly or indirectly to future work opportunities—are common in Hollywood. An influential producer like Weinstein would be in a position to offer a type of service by recommending the actor to a director looking to fill a role.

When Judd arrived at the hotel, she was directed not to the dining room or a conference room, but rather to Weinstein's private hotel room, where the two were alone. Instead of discussing film roles or Judd's professional aspirations, Weinstein—who was clad in a bathrobe—asked Judd if he could give her a massage, which Judd refused. Weinstein then asked Judd to watch him shower, which she again refused. Judd believed that Weinstein intended to physically assault her. Feeling "cornered" and "desperate to escape without angering a man who had the ability to end her budding career," Judd engaged in a mock bargain with Weinstein during which she suggested that she would allow Weinstein to touch her only if she won an Academy Award in one of his films. Weinstein countered, "[W]hen you get nominated," to which Judd replied, "No, when I win." Judd then quickly left the hotel room.

In 1997, director Peter Jackson and producer Fran Walsh were considering adapting J.R.R. Tolkien's *The Lord of the Rings* book trilogy into a series of films. Because of a licensing requirement, any adaptation of the trilogy had to be offered first to Miramax, which Jackson and Walsh did.

As a result of this arrangement, Miramax developed *The Lord of the Rings* films for approximately eighteen months, with Weinstein involved in many casting discussions for the films.

In 1998, Jackson and Walsh invited Judd to a private meeting during which they discussed their vision for the films, sharing confidential creative details about the films in the process. Jackson and Walsh asked Judd which of two major roles she would prefer. Jackson and Walsh liked Judd and intended to cast her in their films, which were set to begin principal photography in 1999.

Shortly after the meeting with Judd, Jackson and Walsh expressed their enthusiasm for casting her to Weinstein. Weinstein responded that Miramax had a "bad experience" with Judd in the past, that she was "a nightmare to work with," and that they should avoid her "at all costs." Although Weinstein's statements did not fit their impression of Judd from their meeting, Jackson and Walsh believed the statements were genuine and ultimately did not cast Judd in *The Lord of the Rings* films or any of their other films as a direct result of the statements. *The Lord of the Rings* film trilogy was a blockbuster success, earning more than $2.5 billion in global ticket sales and thirty Academy Awards nominations, ultimately winning seventeen such awards.

In late 2017, various media outlets reported allegations of sexual harassment and assault against Weinstein by numerous women, including Judd. Following these public allegations, Jackson revealed in a media interview that he chose not to cast Judd in *The Lord of the Rings* films because of Weinstein's statements about Judd's professionalism. Jackson explained,

> At the time, we had no reason to question what [Miramax was] telling us—but in hindsight, I realise [sic] that this was very likely the Miramax smear campaign in full swing. I now suspect we were fed false information about [Judd], and as a direct result [her name was] removed from [*The Lord of the Rings*] casting list.

It was only after this interview that Judd learned why she was not cast in *The Lord of the Rings* films nearly a decade earlier.

In April 2018, Judd filed an action in the Los Angeles County Superior Court asserting four causes of action: (1) defamation; (2) sexual harassment in professional relationships under section 51.9 of the California Civil Code; (3) intentional interference with prospective economic advantage; and (4) violations of California's Unfair Competition Law. After removing the action to federal district court based on diversity jurisdiction, Weinstein filed a motion to dismiss the complaint in its entirety for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), which the district court granted in part and denied in part. The district court granted the motion as to the sexual harassment claim with leave to amend, and denied the motion as to the remainder of Judd's claims. After Judd filed an amended complaint, the district court granted Weinstein's second motion to dismiss Judd's sexual harassment claim— this time with prejudice—and entered final judgment pursuant to Federal Rule of Civil Procedure 54(b) shortly thereafter. Judd timely appealed.

**II**

We review de novo an order granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, accepting as true all well-pleaded allegations of material fact and construing those facts in the light most favorable to the non-moving party. *Puri v. Khalsa*, 844 F.3d 1152, 1157 (9th Cir. 2017).

We also review de novo the district court's application of state law. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991) ("[A] court of appeals should review *de novo* a district court's determination of state law."). "Federal courts are required to 'ascertain from all the available data what the state law is and apply it rather than to prescribe a different rule, however superior it may appear from the viewpoint of "general law" and however much the state rule may have departed from prior decisions of the federal courts.'" *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1266 (9th Cir. 2017) (quoting *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940)). Where the state's highest court has not squarely addressed an issue, we must "predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Lewis v. Tel. Emps. Credit Union*, 87 F.3d 1537, 1545 (9th Cir. 1996) (quoting *Ariz. Elec. Power Coop., Inc. v. Berkeley*, 59 F.3d 988, 991 (9th Cir. 1995)).

The question presented by this appeal is one of first impression under California law. Therefore, we are tasked with predicting how the California Supreme Court would resolve it.

**III**

To determine whether Judd has stated a claim for sexual harassment under section 51.9, we begin our analysis with the statute's plain language. *See Larkin v. Workers' Comp. Appeals Bd.*, 358 P.3d 552, 555 (Cal. 2015) ("In interpreting a statute, we begin with its text, as statutory language typically is the best and most reliable indicator of the Legislature's intended purpose."); *see also United States v. Gallegos*, 613 F.3d 1211, 1214 (9th Cir. 2010). Unless the statute clearly expresses otherwise, we interpret statutory terms in accordance with their ordinary meaning. *See Satele v. Superior Court*, 444 P.3d 700, 704 (Cal. 2019) ("It is well settled that the proper goal of statutory construction 'is to ascertain and effectuate legislative intent, giving the words of the statute their usual and ordinary meaning.'" (quoting *People v. Ramirez*, 201 P.3d 466, 470 (Cal. 2009))); *see also United States v. Neal*, 776 F.3d 645, 652 (9th Cir. 2015). "We consider the language in the context of the entire statute and the statutory scheme of which it is a part, harmonizing provisions relating to the same subject matter, to the extent possible." *Satele*, 444 P.3d at 704 (citations omitted); *see also United States v. Lewis*, 67 F.3d 225, 228–29 (9th Cir. 1995). "If the plain, commonsense meaning of a statute's words is unambiguous, the plain meaning controls." *Holland v. Assessment Appeals Bd. No. 1*, 316 P.3d 1188, 1193 (Cal. 2014) (quoting *Fitch v. Select Prods. Co.*, 115 P.3d 1233, 1236 (Cal. 2005)); *see also Gallegos*, 613 F.3d at 1214.

Enacted in 1994, section 51.9 prohibits sexual harassment in "a wide variety of business relationships outside the workplace." *Hughes v. Pair*, 209 P.3d 963, 974 (Cal. 2009). To state a claim for sexual harassment under the 1996 version of section 51.9—the version applicable to

this appeal—a plaintiff must plead the following four elements:

> (1) There is a business, service, or professional relationship between the plaintiff and defendant. Such a relationship may exist between a plaintiff and a person, including, but not limited to, any of the following persons:
>
>> (A) Physician, psychotherapist, or dentist. . . .
>>
>> (B) Attorney, holder of a master's degree in social work, real estate agent, real estate appraiser, accountant, banker, trust officer, financial planner loan officer, collection service, building contractor, or escrow loan officer.
>>
>> (C) Executor, trustee, or administrator.
>>
>> (D) Landlord or property manager.
>>
>> (E) Teacher.
>>
>> (F) A relationship that is substantially similar to any of the above.
>
> (2) The defendant has made sexual advances, solicitations, sexual requests, or demands for sexual compliance by the plaintiff that were unwelcome and persistent or severe, continuing after a request by the plaintiff to stop.

(3) There is an inability by the plaintiff to easily terminate the relationship without tangible hardship.

(4) The plaintiff has suffered or will suffer economic loss or disadvantage or personal injury as a result of the conduct described in paragraph (2).

Cal. Civ. Code § 51.9(a) (1996).**[2]**

In no uncertain terms, section 51.9 imposes liability for sexual harassment in any "business, service, or professional relationship" that is "substantially similar" to the enumerated examples. *Id.* According to Weinstein, his relationship with Judd cannot be "substantially similar" to any of the enumerated examples because they are so idiosyncratic that there appears to be no rhyme or reason explaining the examples included in the statute. We disagree.

It is clear that each of the enumerated examples consists of a relationship wherein an inherent power imbalance exists such that, by virtue of his or her "business, service, or professional" position, one party is uniquely situated to exercise coercion or leverage over the other. This is the key element common to every example in the statute. For example, teachers can exercise coercive power over their students because they control their students' grades.

---

**[2]** Effective January 1, 2019, section 51.9 was amended to add, among other things, "[d]irector or producer" to the list of persons covered by the statute. Cal. Civ. Code § 51.9(a)(1)(H) (2019). We take no view on whether the amendment clarified or modified existing law, as Judd's sexual harassment claim plainly falls within the scope of the 1996 version of the statute.

Similarly, landlords can exercise coercive power over their tenants because they control access to the tenant's security deposits and, at least to some extent, access to the premises. Notably, "nothing in the language of section 51.9 . . . requires a fiduciary relationship." *C.R. v. Tenet Healthcare Corp.*, 169 Cal. App. 4th 1094, 1109 (2009).

The potential for abuse of one's "business, service, or professional" position that characterizes the enumerated relationships in section 51.9 also exists in the producer-actor relationship. As the Screen Actors Guild-American Federation of Television and Radio Artists explained in its amicus curiae brief, in the film industry today, "a small cadre of top producers and executives still hold considerable power to make or break actors' careers," since "Hollywood is a relationship-driven industry and relationships with one or more of its gatekeepers often is critical for an actor to access the opportunities to compete for the most coveted roles." Judd's allegations provide a well-defined example of such a scenario. She described Weinstein as "a dominant figure in the film business and the gatekeeper to many desirable roles and film projects," such that Judd "believed that alienating or offending him could damage her career." Indeed, Judd alleged that Weinstein himself understood the extent of his influence and cachet in the industry by commenting in one interview that "[i]f styles of filmmaking are changing radically, I feel like the godfather of that change—that's the Miramax legacy."

Accordingly, under the facts alleged, the relationship between Judd and Weinstein was characterized by a considerable imbalance of power substantially similar to the imbalances that characterize the enumerated relationships in section 51.9. That is, by virtue of his professional position and influence as a top producer in Hollywood, Weinstein

was uniquely situated to exercise coercive power or leverage over Judd, who was a young actor at the beginning of her career at the time of the alleged harassment. Moreover, given Weinstein's highly influential and "unavoidable" presence in the film industry, the relationship was one that would have been difficult to terminate "without tangible hardship" to Judd, whose livelihood as an actor depended on being cast for roles. Cal. Civ. Code § 51.9(a)(3) (1996).

Weinstein contends, however, that framing the statute's enumerated relationships as characterized by a power imbalance is untenable because such an imbalance does not *always* apply in each relationship. Weinstein posits that, for example, a building contractor—one of the enumerated persons in section 51.9, *id.* § 51.9(a)(1)(B)—might in some situations exercise power over a homeowner during a kitchen demolition, but might in other situations find himself or herself in a vulnerable position when the homeowner refuses to pay the agreed-upon contract price. Of course, each inquiry into whether a particular relationship falls within the scope of section 51.9 must be informed by the specific facts of that case. *See id.* § 51.9(a)(1) (a covered relationship between a plaintiff and defendant "*may* exist" (emphasis added)); *Tenet Healthcare*, 169 Cal. App. 4th at 1106 ("*Depending on the facts*, a certified nurse assistant can have a service or professional relationship with a patient, as can other hospital staff." (emphasis added)). But the fact that the traditional balance of power in a relationship *may* be flipped in *some* scenarios does not negate the reality that a power imbalance nevertheless tends to exist in these relationships under normal circumstances.

Weinstein further contends that, even if he had a relationship with Judd that falls within the scope of section 51.9, no such relationship existed at the time of their

encounter at the Peninsula Hotel. The argument is unavailing. Judd's claim arises out of the alleged retaliation that followed their meeting, not merely Weinstein's sexual advances. Notably, Weinstein does not argue that a professional relationship did not exist at the time of the alleged retaliation. On the contrary, Judd alleged that Weinstein stated publicly after news broke of the sexual harassment and assault allegations against him that "[a]round the time of *Rings*, Mr. Weinstein cast Ms. Judd in *Frida* and years later, in *Crossing Over*." In any event, Judd sufficiently alleged a "business, service, or professional relationship" at the time of the alleged harassment: Judd alleged that she established a professional relationship with Weinstein after working on the 1995 Miramax film *Smoke*, and went to the Peninsula Hotel in hopes of building upon that existing relationship to discuss future professional endeavors. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). Moreover, Judd alleged that "at the time of the harassment, [she] was discussing potential roles in films produced or distributed by Weinstein or Miramax." This is more than enough to allege a professional relationship at the time of the alleged harassment.

Finally, we pause briefly to address the district court's conclusion that the relationship between Judd and Weinstein cannot be substantially similar to any of the enumerated examples because it "centered around employment or potential employment," and that section 51.9 applies only to relationships outside the workplace. *See Hughes*, 209 P.3d at 974 ("[Section 51.9] covers a wide variety of business relationships outside the workplace . . . ."). Whether Judd and Weinstein's relationship was in fact an employment

relationship outside the purview of section 51.9 is a question for the trier of fact. *Cf. Dynamex Operations W., Inc. v. Superior Court*, 416 P.3d 1 (Cal. 2018). Under the facts alleged—namely, that the general meeting at the Peninsula Hotel was "not a job interview for any particular role," but rather a form of business development by which Judd could expand her professional relationship with Weinstein— Judd's sexual harassment claim survives dismissal.

In sum, we conclude that, as alleged, section 51.9 plainly encompasses Judd and Weinstein's relationship, which was "substantially similar" to the "business, service, or professional relationship[s]" enumerated in the statute. Cal. Civ. Code § 51.9(a)(1)(F) (1996). As in the enumerated relationships, their relationship consisted of an inherent power imbalance wherein Weinstein was uniquely situated to exercise coercion or leverage over Judd by virtue of his professional position and influence as a top producer in Hollywood. We have no difficulty concluding that the California Supreme Court would reach the same conclusion, obviating the need to certify the question.[3] *See Lewis*, 87 F.3d at 1545. Therefore, the district court erred when it dismissed Judd's sexual harassment claim under section 51.9.

## IV

Because we conclude that Judd has sufficiently pled a claim under section 51.9, we reverse the district court's dismissal of Judd's claim under that section and remand for

---

[3] We note that Judd and Weinstein agree that certification to the California Supreme Court is unnecessary to resolve this appeal.

further proceedings on the merits consistent with this opinion.

**REVERSED and REMANDED.  Defendant-Appellee must bear all costs.**